**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **TEXARKANA CHRIST NATIONS CHURCH** | § | |
| | § | |
| *Plaintiff,* | § | **Case No.  5:24-cv-47** |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **HARTFORD FIRE INSURANCE** | § | |
| **COMPANY DBA TWIN CITY FIRE** | § | |
| **INSURANCE COMPANY** | § | |
| *Defendant.* | § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

Plaintiff Texarkana Christ Nations Church ("Plaintiff" and/or the "Church") complains of defendant Hartford Fire Insurance Company dba Twin City Fire Insurance Company ("Defendant" and/or "Hartford"), and would respectfully show as follows:

**I.**
**PARTIES AND PROCESS SERVICE**

1.      Plaintiff is a domestic non-profit corporation incorporated in the State of Texas with its principal place of business in the State of Texas.

2.      Twin City Fire Insurance Company is a corporation organized under the laws of the State of Indiana, with its principal place of business located in Hartford, Connecticut, and registered to engage in the business of insurance in the State of Texas.  Twin City is 100% owned by Defendant, a Connecticut corporation with its principal place of business in Hartford, Connecticut.  Hartford is in turn 100% owned by The Hartford Financial Services Group, Inc., a Delaware corporation with its principal place of business in Hartford, Connecticut.  Hartford may be served with process by serving its registered agent, **CT Corporation System at 1999 Bryan Street, Suite 900, Dallas,**

**Texas 75201-3136**. Plaintiff requests the Clerk issue a summons, which will be served on Defendant concurrently with a copy of this complaint.

## II.
## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this action concerns real property located in Bowie County, Texas, and all or a substantial part of the events giving rise to the claim described herein occurred in Bowie County, Texas. The insurance policy at issue and of which Plaintiff is a beneficiary was to be performed in Bowie County, Texas and the losses under the policy (including payments to be made to Plaintiff under the policy) were required to be made in Bowie County, Texas.  Further, investigation, including communications to and from Defendant and Plaintiff (including telephone calls, mailings, and other communications to Plaintiff) occurred in Bowie County, Texas.

## III.
## NOTICE AND CONDITIONS PRECEDENT

5.      Pre-suit notice was given on January 24, 2024, pursuant to TEX. INS. CODE § 542A.003(a).

6.      All other conditions precedent to suit or payment under the insurance policy at issue in this lawsuit have been satisfied by Plaintiff, excused, or waived by Defendant, or Plaintiff is excused from performance due to Defendant's prior breach of the policy. Defendant has not been prejudiced by Plaintiff's actions, inactions, or delays, if any. Any failures by Plaintiff to satisfy any conditions precedent have not prejudiced the Defendant in this case.

**IV.**
**FACTUAL BACKGROUND AND THE ACTS AND OMISSIONS GIVING RISE TO**
**PLAINTIFF'S CLAIMS**

    A.  **The Property and The Policy.**

7.      This is a claim for property insurance proceeds for damages caused by direct physical loss from hailstorms which passed over the building. Upon information and belief, hail reportedly pounded the area with up to golf ball sized hail greater than 1 inch (depending on the date) in December 2021, June 26, 2022, August 10, 2022, September 4, 2022, and September 25, 2022 ("the Storms"). The Church owns certain real property with improvements located at 600 Sewell Lane, Texarkana, Texas 75501 (the "Property"), which at the time of the Storms was insured by insurance policy no. 46SBAAD1038 issued by Twin City Fire Insurance Company, who is wholly owned by Defendant (the "Policy"). Upon information and belief, Plaintiff renewed and maintained the Policy from July 13, 2021 up through at least July 13, 2023 (by paying annual premiums of more than $10,000) (the "Policy Period"). As such, any direct physical loss caused by hail or wind damage stemming from the Storms would be covered under the Policy Period— while Plaintiff's premiums rose over time, the policy terms and conditions as relevant to the reported claim for hail damage remained identical.

8.      Upon information and belief, the Church was issued its first insurance policy by Hartford (or one of Hartford's numerus subsidiaries) at least fifteen (15) years ago, but Defendant unquestionably has insured the Property since July 13, 2019. The roofing system is believed to have been replaced approximately 13 to 15 years ago, with no major repairs of any kind necessary prior to 2022. It is customary for insurers to perform underwriting inspections to determine the condition and insurability of the Property. The Church believes that Hartford performed such an underwriting inspection to determine the condition and insurability of the Property, creating a Risk

Management Underwriting Report.  Underwriting inspections include an assessment of the condition of the property, including the roof.  Regardless of whether an inspection was conducted prior to issuing the initial policy, Hartford certainly had the opportunity to conduct annual inspections and decline coverage if it had any concerns with regard to the condition of the roofing system.

9.      The Policy contained a 'Special Property Coverage Form," which is an 'all risks' form. While these types of insurance policies are the most expensive, they are also the most robust type of commercial property & casualty policy sold on the market, providing coverage for losses from any covered cause of loss except for certain categories that are specifically excluded.  Unlike 'Basic Cause of Loss' commercial policies, the Policy provided comprehensive coverage for "direct physical loss of or physical damage to [the Church] caused by or resulting from a Covered Cause of Loss."





B. **The Claim and Hartford's Failures to Properly Handle The Claim.**

10.    The Storms struck Texarkana, Texas during the Policy Period, in some cases pounding the area with up to golf ball sized hail greater than 1 inch.  A Benchmark Hail report (excerpt below) reflects that high winds along with varying degrees of damaging hail fell during the Storms.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5th Prior Hail Event | 10-Dec-21 | 0.75 | 50 | 50 | 1.00 | 50 | 50 | 1.00 | 50 | 50 |
| 4th Prior Hail Event | 29-Dec-21 | 0.75 | 50 | < 35 | 0.75 | 55 | 35 | 1.00 | 65 | 40 |
| 3rd Prior Hail Event | 26-Jun-22 | < 0.75 | 25 | 45 | 0.75 | 50 | 50 | 1.50 | 65 | 60 |
| 2nd Prior Hail Event | 10-Aug-22 | 0.75 | 50 | < 35 | 0.75 | 60 | 35 | 0.75 | 70 | 35 |
| 1st Prior Hail Event | 4-Sep-22 | < 0.75 | 5 | < 35 | 1.00 | 50 | < 35 | 1.00 | 50 | < 35 |
| Date of Loss | 10-Apr-23 | 0.00 | 0 | < 35 | 0.00 | 0 | < 35 | 0.00 | 0 | < 35 |
| Most Severe Hail (1/1/09 to today) | 17-Mar-16 | 1.75 | 50 | 40 | 2.00 | 50 | 40 | 2.00 | 50 | 40 |

Historical weather data from the National Oceanic and Atmospheric Administration (NOAA) and the Storm Prediction Center also reflects that over 1 inch of hail was reported within a few miles of the Property on both June 26, 2022 and September 25, 2022. According to NOAA's website, hail that is quarter-sized or larger, with a diameter of 1 inch, is considered severe and weighs 0.5 oz. When hail of this size falls at speeds between 25 and 40 MPH, it can produce disposable energy of 2.3 Joules, which is enough to puncture a roof and certainly sufficient to cause damage.

11.    As a result of the Storms, the Property sustained significant direct physical losses to the thermoplastic roof system consisting of metal panels and single-ply PVC roofing membrane, as well as interior damages to the building caused by water passing through hail indents into the roofing membrane and underlying insulation and the metal panels.  The roofing system was damaged so extensively such that it can no longer perform its intended function and now must be replaced.  The damages sustained by the Church are covered under the Policy.  Prior to the Storms, the roofing system was performing as intended. All of the damages are covered under the Policy.

12.     Despite the damages suffered by Plaintiff because of the Storms, Plaintiff felt fortunate to be protected by the approximately $2,200,000 in insurance coverage Plaintiff procured from Hartford to protect itself from weather-related perils.

13.     From July through September 2022, representatives with the Church began noticing interior leaks in around 16 locations which were not previously apparent.  This prompted a residential roofer and volunteer at the Church to conduct a courtesy inspection to try and determine where the leaks were coming from. He reported signs of recent hail damage marks and indentations on the roof. In early December 2022, the Church sought another opinion from Stonewater Roofing ("Stonewater") – a reputable family-owned roofing company in the area – to identify the extent of hail damage and prepare a scope of loss for the damaged roofing system.  Once Stonewater confirmed that recent hail damage had extensively damaged the roof (at that time, it was believed that the storm on June 26, 2022 was the most likely cause of damage), Plaintiff made a claim (claim no. Y3NF24421) with Defendant on December 14, 2022, requesting payment for "wind and hail" damages to the Property during the Policy Period (the "Claim").  Plaintiff provided its best estimate of when hail may have occurred during the Policy Period as the Date of Loss (DOL)—according to Defendant, Plaintiff allegedly noted October 26, 2022 as the DOL.

14.     As with many hail claims on commercial buildings, the Plaintiff was aware hail had caused some damage to the building, but Plaintiff could not pinpoint a precise date or even the size of hail from any storms which passed over the Property during the Policy Period. While it is common for carriers to inquire about the DOL when taking down information on a claim, this is simply to generally verify whether the insured had coverage during that time—when investigating and adjusting the claim in good faith as part of an onsite inspection, the adjuster's primary role is to determine the cause and extent of the covered losses. However, upon information and belief, no

storm of any kind occurred at the Property on October 26, 2022—although its own weather data demonstrates that Defendant was well-aware of this during the course of its investigation.

15.     After Plaintiff made the Claim, Defendant failed to comply with the Policy, the Texas Insurance Code and Texas law in handling Plaintiff's claim. Further, Defendant has refused to pay all amounts due and owing under the Policy for the Claim.

16.     Mitchell Holland was assigned by Defendant as the initial desk adjuster to the Claim, while Jason Higgins was asked to prepare an estimate as the field adjuster.  Mr. Higgins performed an inspection of the damages on or about December 20, 2022, noting the Type of Loss as "wind damages" and investigating October 26, 2022 as the Date of Loss—a date with no discernible wind or hail. During its joint initial inspection with the field adjuster, Stonewater immediately located evidence of a variety of recent hail impacts all over the roof and *even through the underlying insulation*, all of which was documented in a photo log with annotations and produced to Hartford:

 

**Recovery Board with Damage.jpg**
Upload Date: Wednesday, December 28, 2022 9:12 PM
Uploaded By: Devin Hunter
Photo Description: Roof Sample cut open to show ladder assist hail impacts to insulation below

**Duro-last recovery board with damage.jpg**
Upload Date: Wednesday, December 28, 2022 9:12 PM
Uploaded By: Devin Hunter
Photo Description: Appears to be multilayered Built up roof



**f71e299a-c087-41d3-afb3-db553fc3a036.jpg**
**Upload Date:** Wednesday, December 28, 2022 7:36 PM
**Uploaded By:** Roland Browne







17.     Despite the obvious hail damages and various third-party weather services Hartford and its adjusters had access to, Mr. Higgins prepared an estimate dated December 30, 2022, reflecting a mere $8,943.02 in *total* covered damage (solely to the gutters). It is unclear when this estimate was actually provided to the Church. While recognizing hail damage existed, Mr. Higgins oddly elected to insert a narrative entry into his estimate containing the term "cosmetic"—which conveniently

happens to be an exclusion under the Policy that has been routinely utilized by Defendant over the past several years in a concerted effort to minimize policy proceeds stemming from hail damage to insureds' roofing systems:



| | QUANTITY | UNIT | TAX | RCV | AGE/LIFE | COND. | DEP % | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|---|---|
| hail damage found to metal roof and roof accessories is cosmetic and not functional damage. | | | | | | | | | |
| **Totals: Metal Roofing** | | | 0.00 | 0.00 | | | | 0.00 | 0.00 |

18.    Rather than respond to Stonewater's observations, Mr. Holland and/or Hartford had already made the decision to do nothing more than engage Donan Engineering ("Donan") to inspect the roof and prepare a report of their findings. Donan is a well-known insurance company advocate with significant financial ties to carriers, who consistently finds a basis to assist insurance companies in the denial or underpayment of claims.

19.    Donan performed its first and only inspection of the roofs on January 23, 2023.  Based on Donan's inspection and hail study, Donan concluded that "The roof membrane and the insulation, and the metal panels are not damaged by hail; the water intrusion is not due to storm-created openings in the roof; the water intrusion is long term (years), and it is ongoing; the metal roof is affected by inadvertent man-made damage or human activities during installation; and the cause of water intrusion is continuous ponding of water due to inadequate drainage and condensation on the HVAC ducts."  This was unsurprising, as Mr. Holland and Hartford had specifically retained Donan to assist them orchestrate a prepackaged denial by manufacturing the conclusion that the damage to the Church's roofs was barred by the "Cosmetic Damage Exclusion" under the Policy, along with other common excuses.

20.     On February 21, 2023, Mr. Holland emailed a copy of Donan's report to Iran Pitre with the Church, stating that while the findings indicated the hail left indentations on the metal and membrane roofs, they were "cosmetic in nature" and did "not affect the roof ability to perform as intended"—in short, misrepresenting that an exclusion precluded coverage.  Since the cosmetic exclusion only allegedly applied to the metal roofing, Mr. Holland claimed that he would request that the field adjuster prepare an estimate of damages to the membrane roof.  But the date stamp on the XActimate estimate from Mr. Higgins made clear that his $7,768.02 estimate had been prepared *months* earlier in December—making it even more obvious that Donan had been retained to rubber-stamp the preconceived and erroneous conclusion reached by the field adjuster after recognizing Hartford could be forced to pay out several hundred thousand dollars.

21.     On March 17, 2023, Hartford formally denied the Church's Claim, again attaching Donan's January 27, 2023 report as support for its denial:

> We have completed our investigation and regret to inform you that we must respectfully deny coverage for a portion of your loss. Per the attached report from Donan Engineering, the water is not entering the building due to damage from a covered cause of loss such as wind or hail. The interior water damage is due to long term water intrusion due to inadequate drainage of the roof and condensation on the HVAC ducts. There was also no hail damage found to the metal or membrane roofing systems. These would not be covered by your policy due to the information outlined below.
>
> There was hail damage found to the gutters which will be addressed in a separate mailing.

Hartford not only improperly concluded that the Church's damages were not a "covered cause of loss" under the Policy, but further misrepresented that the following exclusions applied:

Your Policy includes the **Special Property Coverage Form (SS 00 07 07 05)**, which states the following:

**A. COVERAGE**

We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.
\*\*\*

**3. Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
**a.** Excluded in Section **B., EXCLUSIONS;** or
**b.** Limited in Paragraph **A.4.** Limitations; that follow.
\*\*\*

**B. EXCLUSIONS**
\*\*\*

**2.** We will not pay for physical loss or physical damaged caused by or resulting from:
\*\*\*

**c. Miscellaneous Types of Loss:**
**(1)** Wear and tear;
**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
\*\*\*
**(4)** Settling, cracking, shrinking or expansion;

\* \* \*

The **Special Property Coverage Form (SS 00 07 07 05)** also provides as follows:

**B. EXCLUSIONS**
\*\*\*

**3.** We will not pay for loss or damage caused by or resulting from any of the following. But if physical loss or physical damage by a Covered Cause of Loss results, we will pay for that resulting physical loss or physical damage.
\*\*\*

**c. Negligent Work:** Faulty, inadequate or defective:
\*\*\*
**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
**(3)** Materials used in repair, construction, renovation or remodeling; or
**(4)** Maintenance of part or all of any property on or off the "scheduled premises".

Based on the exclusionary language above, we do not insure for loss to property caused by faulty, inadequate or defective maintenance. Therefore, there would be no coverage under your policy for the interior water damage caused by inadequate drainage to the roof.

The **Special Property Coverage Form (SS 00 07 07 05)** states the following;

**A. COVERAGE**
\*\*\*

**4. Limitations**
**a.** We will not pay for direct loss of or damage to:
\*\*\*
**(3)** The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
**(a)** The building or structure first sustains physical damage by a Covered Cause of   Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or
**(b)** The direct physical loss or physical damage is caused by or results from thawing of snow, sleet, or ice on the building or structure.

Of note, the "cosmetic exclusion" was not even referenced.

22.     After receiving the denial, the Church could never get any desk adjuster on the phone for more than one discussion to understand Hartford's claims handling or decision – after one call, Hartford's adjusters would never return telephone calls from the Church's representatives.   The closest response was a March 27, 2023 communication, where Christopher Swift with Hartford wrote:

> "I left a voicemail with you on March 24, 2023, regarding your concerns. Based on the Donan Engineer report, collateral indicators were found showing that hail fell at the property. Donan's inspection determined that the reported hail did not fracture or puncture the membrane of the roof. The holes that were about ½ inch wide in the insulation are below the membrane, and there are no fractures or punctures above them. This indicates that the holes were preexisting. It was also determined that the water-shedding capabilities of the roof were not compromised. Since the water-shedding capabilities were not compromised, there was no physical damage to the roof which would require replacement.
>
> Regarding the metal roof, the insured's policy carries an exclusion for cosmetic damage to metal roof surfacing.  Based on the engineer's report, the damage found to the metal portion of the roof was cosmetic, so no coverage can be afforded.
>
> If you disagree with this assessment, please provide your own engineers report regarding the damage to the roof and we will review it, but at this time, our coverage position stands."
>
> On April 23, 2023, Susan Poblocki (Hartford Team Leader) wrote:
>
> "As per your conversation with Dan Beck, on April 24, 2023, we are waiting for a copy of the engineer report for our review.  As Dan advised, if the opinion differs from our engineer, we will have him review and revise.  Please forward the report as soon as it is received."

23.     Although the Church had no obligation to present its own competing estimate or hire its own experts when essentially being forced to adjust its own loss, the Church was then forced to retain BR Architects and Engineers ("BR") at its own expense.  BR conducted a detailed investigation of the Property, including an evaluation of historical hail events at the location,

eventually determining the Property did sustain wind and hail damage during the Policy Period in their Report dated May 1, 2023, which was subsequently provided to Hartford.

24.    BR addressed many of the erroneous conclusions in Donan's report and more specifically recommended that the entire roof was in need of replacement to restore the roof's structural integrity and ensure the safety and protection of the building.  BR further noted that "part of the roofing surface on the Church was membrane roof over framed structure. The membrane roofing was the most at risk of damage from the impact, size, and duration of hailstones along with ~60 mph wind speed. The structure will sustain issues of prolonged water penetration. There is evidence of water penetration through roof to ceiling, and stains of water can be seen on floor in appendix A below."  In addition to the physical evidence onsite, BR's report referenced weather data from NOAA, Benchmark Hail and HailTrace—all of which reflected damaging hail on various dates during the Policy Period—noting the highest estimated wind speeds during the Storms was on or about June 26, 2022 (60mph).  Yet, Hartford conveniently and selectively ignored all the significant evidence of covered hail and wind damage to the Property.

25.    In response to a rebuttal report authored by Donan on July 26, 2023 in which Hartford's engineer of choice attempted to double-down on its unsubstantiated position that the interior leaks were long turn, BR authored yet another report on August 26, 2023 to address various flaws in Donan's rebuttal report, particularly addressing the cause of water intrusion into the interior spaces.  On September 14, 2023, BR wrote a final supplemental report, citing to various case studies discussing the impact of similar hail damage on PVC roofing systems.

26.    Hartford was previously provided with copies of all three of BR's reports by Plaintiff's former counsel.  While it is undisputed that Donan never responded to BR's supplemental reports,

unfortunately Donan never responded to any of BR's substantive concerns or case studies raised in its reports.

27.     Hartford's failure to reasonably investigate even the basic points and inadequacy of Donan's general conclusion (that the interior leaks and staining on the interior ceiling tiles were a result of condensation from the HVAC units) highlights the one-sided nature of its investigation and indifference to the Church's Claim. Indeed, even a layperson at the Church pointed out to one adjuster on the phone that the leaking only happened when it rained at the Property—and given that the Church holds evening services at night all summer requiring the constant running of the HVACs, Donan's theory on the cause of moisture intrusion amounted to rank speculation. Hartford's egregious denial and failure to consider and investigate the basic points made by Plaintiff's representative regarding the source of interior leaks further exemplifies the financial bias of Hartford over the interests of its insureds.

28.     Plaintiff presented a claim under the Policy. It was Hartford's responsibility, not Plaintiff's, to conduct a reasonable and thorough investigation of the Claim to determine the specific cause of the loss and the amount of loss. Although Hartford and its agents are required by Texas law and the Policy to conduct a reasonable and thorough investigation of the Claim, they have failed to do so within a reasonable amount of time and within the parameters of compliance set forth in the Texas Insurance Code. Rather, Hartford chose to delay its adjustment on the Claim after employing an independent field adjuster who found the damages were related to the hail but were "cosmetic," then immediately employing an engineering firm with a known financial bias towards carriers to support its eventual denial.

29.     Hartford and its agents' improper handling of the Claim subjects Hartford to liability pursuant to TEX. INS. CODE § 541.001, *et seq.* and TEX. INS. CODE § 542.051, *et seq.* Moreover, Hartford violated TEX. INS. CODE § 541.060(a) and engaged in Unfair Settlement Practices by:

a)      **Misrepresenting to Plaintiff client material facts or policy provisions relating to the coverage at issue.**  Specifically, Hartford's retained adjuster represented to Plaintiff that the damage observed was related to the hail but was "cosmetic." Rather than fully compensate Plaintiff for the losses, Hartford failed to adequately assess damages to the Property and as a result grossly undervalued the amount of Plaintiff's covered losses. By significantly underpaying the Claim, Hartford represented that much of the damage caused to the Property was either not covered by the Policy or reflects a deliberate disregard for the obvious damages.  Hartford and its adjusters also knowingly misrepresenting pertinent facts or policy provisions relating to the Church's coverage in their communications with the Church. The Church has been stymied by its insurance carrier who happily accepted its substantial premium payment in exchange for an illusory promise to provide coverage to the Property for at least five (5) years. Additionally, it is unclear when the cosmetic exclusion was actually inserted into the Church's policy during one of its many renewals, and whether Hartford complied with § 2002.001 of the Texas Insurance Code when doing so.

b)      **Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the Claim, even though Hartford's liability under the Policy was reasonably clear.** More specifically, even though Hartford's liability under the Policy was reasonably clear, Hartford failed to conduct their investigation within the parameters of the time frames specified in the Texas Insurance Code and to this date still refuses to accept or deny the covered damages.  Hartford's delay in accepting liability for damages as a result of the hail and wind damage is without justification and an act of bad faith. Hartford's field adjuster used a term of art in his estimate, well aware he was laying the foundation for Hartford to weaponize the "Cosmetic Damage Exclusion" in a manner supporting his pretextual, wholly inadequate and biased investigation on this Claim. Hartford ignored the obvious substantial amount of recent hail damage to the Property, conducting a substandard investigation, and grossly undervalued the Claim. Further, Hartford acted in bad faith when they rejected (in most instances with no explanation) the disinterested reports, bids, and findings of various third parties.  Such conduct is likely contrary to the written property & casualty claims handling guidelines maintained by Hartford.

c)      **Failing to promptly provide Plaintiff with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law for Hartford's liability under the Policy was reasonably clear.**  Despite dozens of e-mails, including Plaintiff's voluntarily providing (without being prompted) estimates, receipts, independent engineering reports and documentation to Hartford, Hartford has never

provided any reasonable basis supporting its delay in accepting liability and certainly no explanation of any kind. Plaintiff is unclear how the significant damage to the Property would not be covered under the terms of the Policy and Hartford's delay is completely without merit. All the while, Hartford still refuses to tender hundreds of thousands of dollars in obvious, covered losses under the Policy, citing vague and completely irrelevant exclusions within the Policy within its disposition letter.

d) **Failing within a reasonable time to affirm or deny coverage of the Claim.** The failure to take a formal coverage position under the Policy for almost five (5) months following the notice of loss *per se* unreasonable. To date, it does not appear Hartford has done anything to verify or substantiate the true extent of my client's losses as submitted by Plaintiff that would be covered by the Policy.

e) **Refusing to pay Plaintiff's Claim without conducting a reasonable investigation with respect to the Claim**. Hartford's investigation was clearly unreasonable because it failed to determine the full amount of Plaintiff's damages, even though the damages were obvious and the true amount of cost to repair the damages was readily ascertainable. Had Hartford conducted a reasonable and thorough investigation of the Claim, they would have determined the actual amount of Plaintiff's covered losses. Moreover, Hartford failed to use appropriate experts to thoroughly investigate the Claim which were not biased in favor of Hartford because of their lengthy financial relationship with insurance carriers in general. Had Hartford done so, they would have concluded the full extent of damage to the Property was covered by the Policy. It was Hartford's responsibility, not Plaintiff's, to conduct a reasonable and thorough investigation of the Claim to determine the specific cause and severity of the claimed loss. Instead, turning their own obligation on its head, Hartford was apparently content to force the Church to prove the cause of the leaks that it reported during Hartford's investigation and also put the burden on the Church to determine (at its own expense) its own scope of loss before Hartford unilaterally rejected same after bringing in Donan—yet, an insured has no obligation under Texas law, the Policy or any insurance carrier's claim handling guidelines in the State of Texas to do so.

30.    Hartford took advantage of Plaintiff's lack of knowledge, ability, experience or capacity to a grossly unfair degree and to Plaintiff's detriment. Hartford's acts also resulted in a gross disparity between the value received and the consideration paid in a transaction involving the transfer of consideration. As a result of Hartford's violations, Plaintiff suffered actual damages. In addition, Hartford committed the above acts knowingly and/or intentionally, entitling Plaintiff to three times its damages for economic relief.

31.    Further, Hartford violated the prompt payment of claims provisions of TEX. INS. CODE §
542.051, *et seq.* by delaying payment of the Claim following Hartford's receipt of all items,
statements, and forms reasonably requested and required, longer than the amount of time provided
by TEX. INS. CODE § 542.058.  Hartford has always had full access to the Property and plenty of
opportunity to properly investigate the Claim and determine the actual amount of damages caused
by the Hailstorm.  Thus, because more than 45 days have passed from December 14, 2022 without
full payment for the Claim, Hartford has violated the time limits of TEX. INS. CODE §§ 542.058
and 542.059. Perhaps more importantly, Hartford failed to timely request an extension on receipt
of any items, statements, and forms that it would need to make a claim decision. As a domestic
carrier, Hartford had no more than 30 business days after receiving notice of the claim from the
Church on or about December 14, 2022 to "request from the claimant all items, statements, and
forms that [Hartford] reasonably believes, at that time, will be required from the claimant." TEX.
INS. CODE § 542.055(a)(3). As such, Hartford was required to request any such information no
later than January 25, 2023. Separately, because well over 45 days have passed from December
14, 2022 without full payment for the Claim, Hartford has violated the time limits of TEX. INS.
CODE §§ 542.058 and 542.059.

    C.    Independent Injuries and Benefits-Lost from Hartford's Conduct.

32.    Aside from its breach of contract, Hartford's delay and other unconscionable actions have
potentially led to additional uncovered losses that either qualify as an "independent injury" or
result from Hartford' actions, and thus are still owed under the "Benefits-Lost Rule" grounded in
Texas common law. As merely one example, Plaintiff's cost of entering into a contract with
Stonewater and incurring engineering costs would ordinarily not be covered under the Policy but
was necessitated by Hartford's conduct outlined herein. Because Hartford's statutory violations

noted above have prejudiced their insured, Hartford is also estopped from denying any benefits that would otherwise be payable under the Policy as if the risk had been covered. Should Hartford subsequently deny *any* portion of the loss based on limitations within the Policy (to be clear, which Plaintiff does not believe will legally apply, given the timing of the adjustment of this loss and underpayment of this Claim, both of which prevented Plaintiff from timely completing repairs), Plaintiff may still recover any damages sustained due to Hartford's actions to date even if the Policy does not cover such losses (*i.e.*, entitlement to replacement cost benefits).

   D. Hartford effectively ignores Plaintiff's efforts to resolve the Claim amicably prior to litigation.

33.    On June 1, 2017, Governor Abbot signed House Bill 1774 into law as Section 542A of the Texas Insurance Code.  This new law was sponsored by approximately sixty state representatives and senators and contains important consumer protections against a variety of unscrupulous practices.  Section 542A.003 in particular requires detailed, comprehensive pre-suit notice that is intended to make the claims and litigation processes more transparent and potentially even avoid unnecessary lawsuits.  Upon receiving notice, an insurer has a right to conduct an inspection, and even make an offer to avoid litigation.  When utilized properly, Section 542A should assist insureds like Plaintiff to avoid protracted litigation over a clear claim.

34.    In compliance with Section 542A.003, Plaintiff sent a pre-suit notice letter with exhibits on January 24, 2024 (the "Notice Letter"). The Notice Letter provided a 16-page single-spaced comprehensive outline of Plaintiff's claims and damages, and quantified Plaintiff's losses by presenting detailed expert reports and photos on the Property.  Even though Plaintiff had no obligation to present its own competing estimate when essentially being forced to adjust its own loss, Stonewater eventually determined through Xactimate—the gold standard to estimate construction scopes used throughout the insurance industry—that the covered replacement cost to

properly and permanently repair the covered damages to the Property was approx. $660,000. The Notice Letter attached Stonewater's estimate, BR's expert reports, and certain receipts and invoices. Upon information and belief, the only information which had not previously been provided to Defendant's adjusters was $3,000 in invoices for temporary repairs from Stonewater Roofing performed in 2023. Plaintiff also offered to take a substantial discount of the total covered damages under the Policy to which it was entitled to avoid protracted litigation.

35.    Not only did Hartford fail to provide any of the responsive documents requested in writing on at least two occasions in January 2024 by the undersigned counsel—Hartford continues to hide the most significant responsive documents which Defendant allegedly relied on to adjust this Claim. Below is an excerpt from the Notice Letter:

### V.    Second Request for Claim-Related Documents

As we requested on January 15, 2024, kindly produce the complete claims file(s) on the Claim within the next fourteen (14) days. This should include any estimates (including any reports or estimates, draft or otherwise), engineering or other consultant reports, and all internal materials that Hartford and its agents and adjusters created or relied upon to process the Claim. Hartford's failure to provide us with any other responsive documents that we requested on behalf of your insured, much less acknowledge our notice of representation, appears to be a continued pattern of delay and failure to provide any reasonable basis supporting Hartford's decision. As previously mentioned, my client remains unclear how the significant damages to the Property sustained by the various summer 2022 hailstorms have been accounted for by Hartford under the terms of the Policy. Unfortunately, Hartford's failure to produce its complete claims file and other highly relevant claim-related documents has made it more difficult for my client to satisfy its obligations within this notice letter to detail the entirety of Hartford's claims handling malfeasance and specifically identify all the covered losses which have not been paid to date under TEX. INS. CODE § 542A.003(b).

### VI.    Production of Underwriting Reports and Materials

Most insurance companies conduct a thorough underwriting process prior to entering into an insurance contract. This process typically includes completion of an underwriting inspection or loss control survey. These reports have material information about the condition of the property prior to the loss. This is especially so, given the length of time that the Church has been insured with Hartford (or one of its subsidiaries) over the last 10+ years. As such, we respectfully request that Hartford produce any such reports within the next thirty (30) days. Since Hartford seemingly is attempting to take the position that some or all of the damage to the Property is not covered as a result of long-term moisture intrusion and wear and tear, this information will be extremely important in determining whether such a defense has merit. To the extent you believe Hartford might take a position that this information is proprietary, I would gladly execute a mutually agreeable confidentiality agreement to facilitate the prompt production of this information.

36.     Regardless, Hartford's sole response to the Notice Letter was to ***untimely*** request another reinspection for Nelson Forensics—*another* engineering company which is *routinely* hired by Hartford and other carriers to investigate property damage claims in Texas. Significantly, Hartford's written request for this inspection was made on March 1, 2024, outside the timeframe permitted under TEX. INS. CODE § 542A.004 ("Not later than the 30th day after receiving a presuit notice given under Section 542A.003(a), a person to whom notice is given may send a written request to the claimant to inspect, photograph, or evaluate, in a reasonable manner and at a reasonable time, the property that is the subject of the claim.").  Even though Plaintiff allowed Nelson Forensics access to leave no doubt it had gone above and beyond to cooperate with Defendant's shoddy and biased investigation, Hartford otherwise refused to reconsider its position, compelling Plaintiff to institute this litigation. Although the findings from this latest inspection are unknown at present, Plaintiff fully expects that Nelson will 'hold the company line' for Hartford.

**V.**
**CAUSES OF ACTION**

37.     Plaintiff reincorporates and realleges each allegation in the preceding paragraphs as if fully set forth herein in support of the causes of action below.

38.     Defendant is liable to Plaintiff for breach of contract, as well as intentional violations of the Texas Insurance Code and breach of the common law duty of good faith and fair dealing.

      **A.**    <u>**Breach of Contract.**</u>

39.      The Policy is a valid, binding, and enforceable contract between Plaintiff and Defendant. Defendant breached the contract by refusing to perform its obligations under the terms of the Policy and pursuant to Texas law. Defendant's breach proximately caused Plaintiff injuries and damages. All conditions precedent required under the Policy have been performed, excused, waived, or otherwise satisfied by Plaintiff and Defendant is estopped from raising the issue due to

Defendant's prior breach of the insurance contract or, Plaintiff is excused from performance due to Defendant's prior breach of the policy.

34.     Due to Hartford's breach of the contract terms and continual denial of the claim, Plaintiff continues to sustain damages to its Property.

  **B.     Noncompliance With Texas Insurance Code: Unfair Settlement Practices.**

40.     The conduct, acts, and/or omissions by Defendant constituted Unfair Settlement Practices pursuant to TEX. INS. CODE § 541.060(a). All violations under this article are made actionable by TEX. INS. CODE § 541.151.

41.     Defendant's unfair settlement practice, as described above, of misrepresenting to Plaintiff material facts relating to the coverage at issue, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(1).

42.     Defendant's unfair settlement practice, as described above, of failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim, even though Defendant's liability under the Policy was reasonably clear, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(2)(A).

43.     Defendant's unfair settlement practice, as described above, of failing to promptly provide Plaintiff with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, for its offer of a compromise settlement of the claim, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(3).

44.     Defendant's unfair settlement practice, as described above, of failing within a reasonable time to affirm or deny coverage of the claim to Plaintiff or to submit a reservation of rights

to Plaintiff, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(4).

45.     Defendant's unfair settlement practice, as described above, of refusing to pay Plaintiff's Claim without conducting a reasonable investigation, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE § 541.060(7).

46.     Defendant's conduct described above compelled Plaintiff to initiate a lawsuit to recover amounts due under its policy by offering substantially less than the amount ultimately recovered. Defendant refused to even offer more than its own grossly undervalued estimates despite actual damages, which were much greater. This continued failure compelled Plaintiff to file suit. TEX. INS. CODE § 542.003(5).

47.     Defendant misrepresented the Policy under which it affords property coverage to Plaintiff, by making an untrue statement of material fact. TEX. INS. CODE § 541.061(1).

48.     Defendant misrepresented the insurance policy under which it affords property coverage to Plaintiff by failing to state a material fact that is necessary to make other statements made not misleading. TEX. INS. CODE § 541.061(2).

49.     Defendant misrepresented the insurance policy under which it affords property coverage to Plaintiff by making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of material fact and failing to disclose a matter required by law to be disclosed, TEX. INS. CODE § 541.061(3).

50.     Defendant knowingly committed the foregoing acts, with actual knowledge of the falsity, unfairness, or deception of the foregoing acts and practices, in violation of TEX. INS. CODE § 541.002(1).

**C.**    **Prompt Payment of Claims Violations.**

51.    The Claim is a claim under an insurance policy with Defendant of which Plaintiff gave

Defendant notice. Defendant is liable for the Claim. Defendant violated the prompt payment

of claims provisions of TEX. INS. CODE § 542.051, *et seq.* by:

a)    Failing to acknowledge receipt of the Claim, commence investigation of the Claim, and/or request from Plaintiff all items, statements, and forms that Defendant reasonably believed would be required within the time constraints provided by TEX. INS. CODE § 542.055. Specifically, Defendant failed to commence a proper investigation of the Claim and failed to request the documents and other forms it required to properly adjust Plaintiff's Claim within a reasonable time and manner;

b)    Failing to notify Plaintiff in writing of its acceptance or rejection of the Claim within the applicable time constraints provided by TEX. INS. CODE § 542.056. Defendant failed to provide Plaintiff with a proper explanation of their Claim decision. Defendant delayed resolution of the Claim without a proper explanation for their delay, and then relied on improper Policy exclusions in the denial of Plaintiff's Claim without a proper explanation for their reasoning behind their denial; and/or by

c)    Delaying payment of the Claim following Defendant's receipt of all items, statements, and forms reasonably requested and required, longer than the amount of time provided by TEX. INS. CODE § 542.058. To date, Defendant has refused to pay the full amount owed under the Policy for the Claim. Defendant continues to delay full resolution of the Claim by refusing to properly adjust Plaintiff's Claim.

52.    Defendant's violations of these prompt payment of claims provisions of the Texas

Insurance Code are made actionable by TEX. INS. CODE § 542.060.

**D.  Breach of the Duty of Good Faith and Fair Dealing**

53.    The Texas Supreme Court has recognized a "duty on the part of insurers to deal fairly and

in good faith with their insureds.  That duty emanates not from the terms of the insurance contract,

but from an obligation imposed in law 'as a result of a special relationship between the parties

governed or created by a contract.'" *Viles v. Security Nat. Ins. Co*., 788 SW 2d 566, 567 (Tex.

1990) (citing *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex. 1987)).

Therefore, an insured can institute a cause of action against its insurer for breach of the duty of good faith and fair dealing.

54.     Defendant and Plaintiff are in a special relationship, created by the insurance contract, giving rise to a duty on the part of Defendant to deal fairly and in good faith with Plaintiff, who is the insured.

55.      Defendant breached its duty of good faith and fair dealing by:

    a)    Failing to provide a reasonable basis for denial or underpayment of the claim; and/or

    b)    Failing to determine whether there was a reasonable basis for denial or delay of the claim. *Arnold*, 725 S.W.2d at 167.

56.     Specifically, Defendant denied Plaintiff's claim, misrepresenting that "the damages were cosmetic." Defendant's misrepresentation constitutes a breach of its duty of good faith and fair dealing. As fully described above, Defendant further breached its duty of good faith and fair dealing by failing to adequately and reasonably investigate and evaluate Plaintiff's Claim, although Defendant knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear.

57.     Defendant systematically and routinely denies or underpays valid claims to the detriment of its policyholders. As set forth above, the wrongful acts and omissions Defendant committed in this case, or similar acts and omissions, occur with such frequency that they constitute a general business practice of Defendant with regard to handling these types of claims.

58.     By virtue of its systematic wrongful denials, Defendant compels its policyholders to seek legal representation and initiate and maintain a suit to recover an amount due under the policy by offering nothing or substantially less than the amount that will be recovered in a suit brought by the insured.

59.     Defendant either failed to adopt or implement reasonable standards for prompt investigation of claims arising under its policies or is deliberately adopting standards calculated to maximize its profit to the detriment of its policyholders. Defendant is knowingly directing its personnel, agents and/or adjusters to undervalue or underpay valid claims.

60.     Defendant knowingly committed the act of denying and/or underpaying claims without a reasonable basis; therefore, Plaintiff is entitled to actual and exemplary damages at law.

**VI.**
**DAMAGES**

61.     Plaintiff will show that all the aforementioned acts, taken together or singularly, constitute the producing causes of the damages sustained by Plaintiff. Plaintiff is entitled to the actual damages resulting from the Defendant's violations of the law.   These damages include the consequential damages to its economic welfare from the wrongful denial and delay of benefits including loss of use of the Property, in addition to the other actual damages permitted by law.

62.     For breach of contract, Plaintiff is entitled to regain the benefit of Plaintiff's bargain, which is the amount of Plaintiff's Claim to restore the Property to its pre-loss condition, together with reasonable and necessary attorneys' fees.

63.     For noncompliance with the Texas Insurance Code, Unfair Settlement Practices, Plaintiff is entitled to actual damages, which include the loss of the benefits that should have been paid pursuant to the Policy, court costs and attorney's fees. For knowing conduct of the acts complained of, Plaintiff asks for three times Plaintiff's actual damages. TEX. INS. CODE § 541.152.

64.     For noncompliance with Texas' Prompt Payment of Claims Act, Plaintiff is entitled to the amount of Plaintiff's claim, penalty interest per annum (calculated by adding five (5) percent to the current interest rate as determined by the Board of Governors of the Federal Reserve

System) of the amount of Plaintiff's claim as damages, together with attorney's fees.  TEX. INS. CODE § 542.060.

65.     For breach of the common law duty of good faith and fair dealing, Plaintiff is entitled to compensatory damages, including all forms of loss resulting from the insurer's breach of duty, such as additional costs, economic hardship, losses due to nonpayment of the amount the insurer owed, and exemplary damages.

66.     For the prosecution and collection of this claim, Plaintiff has been compelled to engage the services of the law firm whose name is subscribed to this pleading. Therefore, Plaintiff is entitled to recover a sum for the reasonable and necessary services of Plaintiff's attorneys in the preparation and trial of this action, including any appeals to the Fifth Circuit and/or the Supreme Court.

## VII.
## ATTORNEYS' FEES

67.     For the prosecution and collection of this claim, Plaintiff has been compelled to engage the services of the law firm whose name is subscribed to this pleading. Therefore, Plaintiff is entitled to recover a sum for the reasonable and necessary services of Plaintiff's attorneys in the preparation and trial of this action, including any appeals to the Fifth Circuit and/or the Supreme Court.

68.     Plaintiff is entitled to reasonable and necessary attorney's fees pursuant to Texas Civil Practice and Remedies Code Sections 38.001-38.003 because it is represented by an attorney, presented the claim to Defendant, and Defendant did not tender the just amount owed before the expiration of the 30th day after the claim was presented.

69.     Plaintiff further prays that it be awarded all reasonable attorney's fees incurred in prosecuting its causes of action through trial and any appeal pursuant to Sections 541.152 and 542.060 of the Texas Insurance Code.

## VIII.
## PRE-AND-POST JUDGMENT INTEREST SOUGHT

70.    Plaintiff further seeks the recovery of all interest allowed at law, including pre-judgment and post-judgment interest.

## XI.
## JURY DEMAND

71.     Plaintiff hereby requests a jury trial and tenders the appropriate jury fee.

## PRAYER

In summary, Defendant failed to comply with the Texas Insurance Code and Texas Law in handling the Claim, and has failed to pay all amounts due and owing under the Policy for the Claim.  Defendant failed to perform a thorough investigation of Plaintiff's Claim, failed to employ appropriate or qualified consultants to evaluate the damages, delayed resolution of the Claim under Texas law, and misrepresented applicable scopes of damages as well as the terms of the Policy. Because of these violations of law and wrongful conduct, Plaintiff sustained and continues to sustain significant damages, including but not limited to property damage, diminution of property value, attorneys' fees, financial harm, and other consequential damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon trial hereof, Plaintiff has and recovers such sums as would reasonably and justly compensate Plaintiff in accordance with the rules of law and procedure, both as to actual damages, statutory penalties and interest, treble damages under the Texas Insurance Code and all punitive and exemplary damages as may be found.  In addition, Plaintiff requests the award of attorney's fees for the trial and any appeal of this case, for all costs of Court on their behalf expended, for pre-judgment and post- judgment interest as allowed by law, and for any other and further relief, either at law or in equity, to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,

LUNDQUIST LAW FIRM

By:    */s/   William W. Lundquist*
        WILLIAM W. LUNDQUIST
        Texas Bar No.: 24041369
        Will@LundquistLawFirm.com
        675 Bering Dr., Ste. 850
        Houston, Texas 77057
        Telephone: (346) 704-5295
        Fax: (713) 583-5586

ATTORNEY-IN-CHARGE FOR PLAINTIFF